## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Robert Frenkel** ) | |
| 14 Wyndham Close ) | |
| White Plains, New York 10605 ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **Civil Action No. 1:21-cv-453** |
| ) | |
| **The George Washington University** ) | |
| 1918 F Street, NW ) | |
| Washington, DC 20052 ) | |
|     Serve: Beth Nolan ) | |
|     Office of the Senior Vice President ) | |
|     and General Counsel ) | |
|     2000 Pennsylvania Avenue, NW, Suite 305 ) | |
|     Washington, DC 20006 ) | |
|     Phone: (202) 994-6503 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Robert Frenkel ("Plaintiff") as and for his complaint against Defendant The George Washington University ("GWU"), hereby alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for breach of contract, breach of the implied duty of good faith and fair dealing, unjust enrichment, and promissory estoppel/ detrimental reliance. The complaint seeks relief against GWU for its arbitrary, bad faith, and capricious conduct that prevented Plaintiff from completing his doctoral program of study at GWU and receiving his Ph.D. degree; and in conjunction with this, seeks relief against GWU for its arbitrary, capricious, and bad faith conduct in the hearing of Plaintiff's grievance against Professor Nathan Brown ("Brown"), and the

1

wrongful termination of Plaintiff's candidacy for his Ph.D. degree and the wrongful termination of his enrollment at GWU.

## II. **PARTIES**

2.  Plaintiff is a resident of the State of New York. During the relevant time, he was a matriculated student at GWU.

3.  GWU is a congressionally-chartered nonprofit corporation and comprehensive private university, with its principal place of business at 1918 F Street, NW, Washington, DC 20052.

## III. **JURISDICTION AND VENUE**

4.  Plaintiff brings this complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.  This Court has supplemental jurisdiction over all claims that form part of the same case or controversy pursuant to 29 U.S.C. § 1367.

6.  This Court may exercise personal jurisdiction over Defendant pursuant to Federal Rules of Civil Procedure 4(k)(1)(A) because GWU's principal place of business is in the District of Columbia, and because the wrongful acts alleged in this Complaint were committed by Defendant in the District of Columbia, among other venues.

7.  Venue is proper the District of Columbia pursuant to: (1) 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia, and (2) 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in the District of Columbia.

## IV. <u>FACTS</u>

### A.   <u>Introduction</u>

8.   Plaintiff was a student in the political science doctoral program at GWU's Columbian College of Arts and Sciences ("CCAS") from August 2008 until his termination from the program by GWU on August 18, 2018.

9.   Plaintiff accepted GWU's letter offer of admission, dated March 5, 2008, to the Doctor of Philosophy degree ("Ph.D") in the Political Science program, and began his studies at GWU in the Fall semester 2008. Plaintiff completed the political science department doctoral program's pre-candidacy requirements, including coursework, major and minor field comprehensive exams, and his dissertation prospectus. Plaintiff was then admitted to candidacy and became "all but dissertation" ("ABD") on or about February 24, 2015, meaning that the sole remaining substantive requirement for Plaintiff to receive his Ph.D. was the successful completion of his dissertation.

10.  While Ph.D. students at GWU are generally required to complete all degree requirements within eight years, if students wish to study beyond eight years, they must request and receive an extension of time (referred to as "extension of time to degree"). *See,* **Exhibit A** (pertinent excerpt from CCAS│University Bulletin 2017-2018│GWU), attached.[1]

11.  After becoming ABD, Plaintiff requested and received two extensions of time to degree for reasons relating to his parents' health. In his extension requests, Plaintiff explained the adverse impact that his father's death from improperly administered anesthesia, and his mother's cancer diagnosis, had upon his ability to complete his degree within eight years. In particular, as an

---

[1] For the sake of brevity, this complaint provides only the pertinent provision of GWU's 2017-2018 University Bulletin in Exhibit A.

attorney, Plaintiff did a substantial amount of work to help in connection with his mother's legal case against the hospital for its negligence in his father's death.

**B.  Plaintiff's second extension of time to degree contract[2]**

12. Plaintiff applied for his second extension of time to degree with CCAS on May 1, 2017. *See,* **Exhibit B** attached for a copy of Plaintiff's application. On June 14, 2017, Plaintiff was notified by CCAS that his application was approved with an extension of time to degree "through Summer 2018," containing an August 17, 2018 Electronic Theses and Dissertations ("ETD") date. *See,* **Exhibit C** (June 14, 2017 CCAS email to Frenkel), attached. Plaintiff accepted the extension of time in his June 16th email to CCAS. *See,* **Exhibit D** (June 16, 2017 Frenkel email to CCAS), attached.

13. The extension of time to degree contract contained in the June 14th CCAS email was a mutually binding agreement between Plaintiff and GWU in which Plaintiff was given an August 17, 2018 deadline ("Summer 2018 deadline") to complete his dissertation. Moreover, Plaintiff was given the discretion to determine whether to continue his studies into the Summer 2018 semester. The extension approval states, in pertinent part, that:

> [Plaintiff] is approved for a final extension of time to degree through Summer 2018.
> . . . If you [Plaintiff] choose to complete in Summer 2018, you must . . . [register]
> for Summer term, Continuous Enrollment, (CE) UNIV 0982."

*See,* **Exhibit C**.

14.  Only CCAS possessed the authority to set Plaintiff's extension of time to degree deadline.

15. In return for Plaintiff's payment of GWU tuition and other fees and costs (*i.e.* enrollment costs associated with continuous enrollment for the Summer 2018 semester), GWU was obligated

---

[2] On May 16, 2016, Plaintiff was notified by CCAS that his first extension of time to degree request was approved. It was approved through April 1, 2017 (end of Spring 2017 semester).

to provide Plaintiff with educational services "through Summer 2018," with an August 17, 2018 ETD date.

**C. Brown's arbitrary, bad faith, and capricious conduct**

16. During the relevant time period, Brown was a duly authorized agent of GWU and Plaintiff's dissertation advisor.

17. Along with Brown, Plaintiff's dissertation committee was comprised of two other members, readers Professor Bruce Dickson ("Dickson") and Professor Henry Hale ("Hale").

**1. Brown arbitrarily refused to recognize CCAS' Summer 2018 deadline, insisting on an earlier Spring 2018 semester deadline.**

18. Plaintiff had submitted his May 1, 2017 extension request application to CCAS after consultation with Brown. The application included a "proposed schedule with dates for completion of the remaining components of [Plaintiff's] dissertation" with a timeline for April 1, 2018 (Spring 2018 deadline). However, as stated above, the extension of time to degree granted to Plaintiff by CCAS, on June 14, 2017, provided Plaintiff with an extension of time to degree until August 17, 2018.

20. In a March 6, 2017 email to Plaintiff, Brown made clear that his role in the extension request process was limited to merely estimating the amount of time required for Plaintiff to complete his dissertation. Brown deferred judgment on all other matters, including the setting of Plaintiff's deadline to CCAS. In the March 6 email, Brown described his role in the extension request process, stating that: "My own feeling is that it is primarily up to the grad school (*i.e.* CCAS) to make a decision based on the reasoning you provide [in the extension request application]; my only role would be to estimate the time required." *See,* **Exhibit E** (March 6, 2017 Brown email to Frenkel), attached.

21. Despite it being objectively clear that CCAS solely possessed the authority to determine Plaintiff's extension deadline, and Brown's own statements acknowledging that he understood that solely CCAS possessed such authority, Brown arbitrarily refused to recognize the Summer 2018 deadline set by CCAS. Instead, Brown insisted that Plaintiff adhere to the shorter Spring 2018 deadline schedule that was proposed in the May 1, 2017, extension request application.

22. In October 2017, when it became apparent to Plaintiff that he needed more time to complete his dissertation than provided for under the shorter Spring 2018 graduation timeline schedule, Plaintiff sought to exercise the authority provided by CCAS to continue to work on his dissertation into the Summer 2018 semester. Accordingly, Plaintiff informed Brown regarding the need to work on his dissertation into the Summer. However, despite Brown's awareness of the terms of CCAS' extension approval, on October 10, 2017, Brown declined Plaintiff's request to work into the Summer, and urged Plaintiff to instead voluntarily withdraw from the doctoral program. Thereafter, when Plaintiff was unable to meet the next dissertation chapter's submission date under the Spring 2018 timeline schedule, and he asked Brown for more time to complete the chapter, in an October 17, 2017 email, Brown stated that: "I want to reiterate that the [Spring 2018 timeline schedule] is the one that the committee is using. . . these were not target dates but deadlines. . . . My worry is that you interpreted the [Summer 2018] deadline of August imposed by the graduate school as somehow superseding [the Spring 2018] timeline. If so, that is a mistake--that interpretation is not shared by the committee."

23. Because of Brown's arbitrary unwillingness to extend Plaintiff's timeline into the Summer, Plaintiff was ultimately compelled to submit his next chapter (the Jordan case study) to his committee incomplete on October 23, 2017.

24.     In response to an email from Brown questioning Plaintiff about the chapter's incompleteness, particularly the absence of any archival work, on November 5, 2017, Plaintiff replied that, given the macro nature of his study, which covers two regions and three primary case studies (over extended periods of time), there was a need to rely more heavily on secondary sources, and that he had had less time than he anticipated when he had drafted the timeline to do archival research. Plaintiff further stated that he had done some preparatory work by having met with GW librarians to learn about archival research, and how to best conduct it, but had not had the time to begin his archival research yet. And, Plaintiff requested to pare back the scope of his archival research to focus on U.S. archival research, and exclude U.K. archival research.

25.     In response to Plaintiff's explanation for the chapter's incompleteness, in a November 6, 2017 email, Brown stated "I think this does raise some problems." Then he reiterated the need for Plaintiff to stick to the Spring timeline, and implicitly threatened Plaintiff's status in the doctoral program by informing Plaintiff that he was bringing in the other committee members and the Political Science Director of Graduate Studies ("DGS") for consultation. Brown also asked Plaintiff to produce a new timeline, and  stated that: "Requesting this timeline does not indicate approval of any modification, but it would be helpful to have a very clear idea of what you are proposing before proceeding." While bringing in the other committee members to discuss proposed changes to Plaintiff's timeline seemed perfunctory to Plaintiff, bringing in the DGS seemed unnecessary and minatory, given that Plaintiff had received an extension of time from CCAS through the Summer, and the DGS, as department head, is not customarily involved in perfunctory meetings between a student and his committee.  As Brown had indicated that he had "problems" with Plaintiff's explanation, and was refusing to accept the Summer timeline, bringing

the DGS in for consultation seemed to portend that discussions of grave negative consequences to Plaintiff's status at the University would take place at the meeting.

26.   On November 13, 2017, Plaintiff emailed Brown a draft timeline with a schedule providing for Summer graduation. Plaintiff also let Brown know that he was told by GW librarian, Amanda Steinberg, that the most important U.K. Archival database (The Confidential Print: Middle East, 1839-1969) that Plaintiff needed to conduct his U.K. archival research (which Brown had stated was likely to be more important than the U.S. archival research in his Nov. 6 email), would only be available to Plaintiff through GW's Gelman Library by the middle of 2018. In response, Brown raised a number of issues[3] and stated: "Would it be possible for you to come up with a timeline that maintain[ed] something in line with [the Spring timeline]? I'm not sure how the committee would view extending the process, but speaking for myself, I would be unlikely to endorse any postponement in that schedule."

27.   On November 16, 2017, in a lengthy email response, Plaintiff addressed the issues raised by Brown[4] and concluded by expressing his desire to work into the Summer.

28.   In response, on November 18, 2017, Plaintiff received an email from Brown, copying the other committee members and the DGS, stating that he had reviewed Plaintiff's responses about his Summer timeline and rejecting Plaintiff's timeline. In the email, in brief, Brown reiterated his position, stating that: "[T]he [Spring] timeline was not supposed to be a flexible document; the deadlines were -- as I mentioned before when we met and by email -- real deadlines." And Brown rejected Plaintiff's Summer timeline out of hand, stating that, "I don't

---

[3] These issues included: asking Plaintiff to spell out when he was going to be doing which archival work more clearly; asking for an explanation as to the reason that Plaintiff had redrafted the Jordan chapter before doing the archival work; and inquiring about a draft chapter (Theory Chapter) that, in the interim, on Nov. 4, Plaintiff had submitted to Brown, but not yet to the committee.

[4] This included: exhaustively detailing his archival work; providing a clear explanation as to the reason that he had drafted the Jordan chapter before doing the archival research; and asking Brown to let him know if Brown would like him to circulate the draft introduction chapter of his dissertation to the committee.

think your timeline is really a promising basis for discussion." Finally, Brown urged Plaintiff to end his Ph.D. studies. *See,* **Exhibit F** (November 18, 2017 Brown email to Frenkel), attached.

29.   As a result of Brown's unreasonable refusal to allow Plaintiff to continue to work on his dissertation into the Summer of 2018, and his urging Plaintiff to discontinue working on his dissertation, Plaintiff felt that he had no alternative but to dismiss Brown from his committee. Therefore, in a November 20th email dismissing Brown, Plaintiff thanked Brown for the work that he had done on his dissertation, and let Brown know that he would contact his other committee members about proceeding forward with his dissertation.

30.   Brown's conduct, in persistently refusing to countenance Plaintiff's continuing to work on his dissertation through the Summer of 2018, was arbitrary and capricious. Brown's repeated insistence that the Spring timeline was inviolate, and Brown's refusal to accept CCAS' Summer 2018 deadline, was baseless. Brown's superiors at CCAS had provided Plaintiff with an extension of time to degree "through Summer 2018", and Brown simply did not have any authority to ignore CCAS' decision. Moreover, by Brown's own admission, the Spring timeline was only an "estimate" and CCAS made the final determination. Nevertheless, despite his lack of authority over the matter, Brown arbitrarily and capriciously persisted in ignoring and refusing to comply with CCAS' decision.[5]

31.   Instead of working with Plaintiff to revise his timeline to provide for a schedule for Summer 2018 graduation, Brown's arbitrary conduct resulted in substantially hindering and delaying Plaintiff's dissertation progress. In particular, Brown detrimentally diverted a substantial amount of Plaintiff's limited valuable time away from working on his dissertation by compelling

---

[5]  Plaintiff believes and asserts that Brown's arbitrary behavior was motivated, most significantly, by two factors: first, by Brown's desire to avoid work on Plaintiff's dissertation during the summer semester; and, second, out of a desire to retaliate against Plaintiff for Plaintiff's unwillingness to accede to Brown's desire and urging for Plaintiff to voluntarily terminate his doctoral studies.

Plaintiff to: (i) repeatedly engage in lengthy and time consuming exchanges for recognition of CCAS' decision concerning extending Plaintiff's timeline into the Summer, and (ii) to work in an uneconomical manner to meet Brown's Spring timeline, which then caused Plaintiff to submit incomplete work on chapters instead of handing in completed chapters, as would have been possible under the Summer schedule. In addition, Plaintiff was subjected to the unnecessary distraction of pressure from Brown to end his doctoral studies.

> ## 2. Brown, in bad faith, breached his agreement with Plaintiff to review his dissertation draft chapters on an ongoing basis.

32.   In light of Brown's bad faith and arbitrary conduct, on November 27, 2017, Plaintiff approached one of his other two committee members, Hale, to inquire about his willingness to take over as his dissertation chair. Given the limited amount of time remaining for Plaintiff to complete his dissertation, Hale was the only viable replacement option. In a November 28, 2017 response to Plaintiff's email inquiry, Hale stated that, though he would not categorically rule out taking over as chair, he did not think that doing so would be feasible/ possible at that point, and that changing chairs would not be in Plaintiff's best interest if he was determined to keep working towards the degree and successfully defend his dissertation. And Hale suggested that they discuss the matter further in a meeting that Plaintiff had scheduled with Hale and Dickson to ascertain Dickson's input.

33.   On November 29, 2017, Plaintiff met with his other committee members, Dickson and Hale, to discuss the situation concerning Brown and Plaintiff's archival research.

34.   Regarding the archival research, Plaintiff accepted the two committee members' decision in the meeting that, in proceeding forward, he would do the archival research, which based on authority Plaintiff did not believe was necessary. Plaintiff also informed Dickson and Hale that GWU librarian Amanda Steinberg notified him on November 20th that GWU now possessed the

Confidential Print database that he needed to perform his U.K. archival research, and he was, therefore, only now able to complete that archival research. After the meeting, Plaintiff followed up with Dickson and Hale in emails on December 1st, 14th, and 17th, fully discussing his archival work, and they did not express any concerns. Plaintiff also detailed his archival work to Brown in an email dated December 14th, and Brown did not reply with any concerns.

35.   Regarding Brown, Plaintiff was advised by Hale and Dickson to contact Brown about his returning as dissertation chair. Thus, Plaintiff had no option but to proceed with Brown as his dissertation chair.

36.   After the meeting, Plaintiff exchanged emails with Brown between November 30 and December 18, 2017. In these email discussions, on December 6, Plaintiff asked Brown to confirm that he was willing to continue serving on his committee through the Summer, and on December 8, Brown replied in the affirmative. Furthermore, the terms of Brown's return were set in an agreement that was mandated by Brown ("Brown Contract"). Under the Brown Contract, in return for Plaintiff working on his dissertation chapters in an order that Brown prescribed ("sequence"), Brown was obligated to review Plaintiff's dissertation chapter drafts on an ongoing basis as they were submitted. For the entire email conversation from November 30, 2017 through December 18 2017 between Plaintiff and Brown, *see* **Exhibit G**, attached.

37.   In a December 14, 2017 email, Brown characterized what he had agreed to as "my offer to read drafts as they come in." *Id*. In a December 16, 2017 email, Brown formally required Plaintiff to accept the agreement in writing before he would be willing to agree to return to work on his committee. *Id*. And, in a December 18, 2017 email, Plaintiff accepted the offer. *Id*. Regarding the agreement, in the December 8 , 2017 email referred to above, Brown wrote that: "The August date mentioned [in CCAS's approval of your petition] is for filing an approved final

copy [of your dissertation]. I am not in a position to make any changes in that. . . . I will not obstruct any effort you make and will indeed, as I said earlier, read drafts that are submitted in accordance with the sequence agreed to." *Id*. Moreover, under the agreement, Brown specified as his remedy, in the hypothetical situation that Plaintiff were to be in non-compliance with the agreement, as being to "return the drafts and ask [Plaintiff] to resubmit them when they are ready to present." *Id*.

38.     Following Brown's return as Plaintiff's dissertation chair effective December 18, 2017, in line with Brown's prescribed sequence in the agreement, Plaintiff submitted revisions to a chapter (Theory chapter) on January 22, 2018. In line with the sequence, Plaintiff then proceeded to work on his next chapter which included archival research (Jordan chapter). As Plaintiff had not received any feedback on that chapter's previous draft submission to the committee from October 23, 2017 (other than feedback concerning citing primary sources and doing archival research), Plaintiff inquired by email to the committee, on February 23, 2018, whether there was any additional feedback. Plaintiff also re-affirmed his commitment to doing the archival research, stating that: "I'll make sure to include my primary source and archival research materials in the revised chapter." *See,* **Exhibit H**, attached.

39.     In response to Plaintiff's email, Brown responded on February 23rd, by returning to an old, and previously resolved, disagreement from November 2017, over Plaintiff's chapter draft submission before completing the archival research. This issue had been discussed and resolved in Plaintiff's November 29, 2017 meeting with his other committee members. Moreover, Plaintiff's plan concerning his archival research had been accepted by the other committee members (December 1st, 14th, and 17th emails), and implicitly by Brown by his lack of concern about the archival research in his response to Plaintiff's December 14, 2017 email. *See, supra*. On February 26, 2018, Plaintiff responded by email that he believed there was good authority for his

having proceeded as he had done. In addition, Plaintiff reiterated, as he had written in his February

23 email, that the revised chapter that he would be submitting would include his archival research.

*See*, **Exhibit H**.

40.   In response to Plaintiff's email dated February 26, 2018, Brown made clear that he

would no longer abide by the Brown Contract. On February 26, Brown wrote that he would no

longer review drafts of Plaintiff's dissertation chapters on an ongoing basis as they came in, as he

had committed to do in the Brown Contract, and, instead, Brown would only review any further

work after Plaintiff had completed a full draft of his dissertation. In response to Plaintiff's February

26 email, Brown wrote, "…I therefore prefer to wait until you have a draft that is fully based on

the work that you have repeatedly said you would undertake." *See*, **Exhibit H**. Thus, after

reviewing only a single chapter draft in January 2018, Brown breached his agreement with Plaintiff

by subsequently refusing to review anything other than a completed dissertation manuscript.

41.   By his February 26 email, Brown exhibited clear bad faith in breaching the Brown

Contract by reneging on his agreement to review Plaintiff's dissertation chapters on an ongoing

basis. Instead of Plaintiff submitting his forthcoming chapters of his dissertation and Brown

returning any chapter to Plaintiff that Brown believed was not ready and asking Plaintiff to

resubmit it when it was ready to present, Brown refused to read the forthcoming chapter of

Plaintiff's dissertation and further refused to read any other chapter moving forward until Plaintiff

had finished a complete draft of his dissertation. Brown clearly acted in bad faith by willfully

rendering imperfect performance and by failing to cooperate with Plaintiff's performance on the

contract. Brown acted in an effort to evade the spirit of his bargain with Plaintiff, which prescribed

his reading chapters on an ongoing basis through the Summer of 2018.

42.   From November 2017 through February 2018, Brown's bad faith conduct wasted additional of Plaintiff's valuable time, which substantially hindered and delayed Plaintiff's progress on his dissertation. During this period, instead of promptly returning to Plaintiff's dissertation committee and working with Plaintiff in a constructive manner to help him progress towards completing his dissertation, as is the customary role of the dissertation advisor, Brown: (i) persisted in advising Plaintiff to end his work on his dissertation (**Exhibit G**), (ii) engaged Plaintiff in protracted and time-consuming email discussions lasting until December 18 over the terms of his return to Plaintiff's committee (*id.*),  and (iii), thereafter, in bad faith, breached the Brown Contract, which Brown himself had insisted upon (**Exhibit H**).

43.   As a result of Brown breaching the Brown Contract, Plaintiff was compelled to move forward in working on his dissertation without any monitoring of his work by his advisor.

### 3.   Brown capriciously gave Plaintiff one day's notice of an impromptu deadline to complete an approvable "as is" dissertation manuscript.

44.   On June 8, 2018, Plaintiff notified his committee by email that he was planning on submitting all of his dissertation chapters soon, except for the conclusion. *See* **Exhibit I,** attached. That same day, Brown responded by email re-iterating his position that he would only review a full dissertation manuscript. He wrote:

> *Rob, this [the February 26 email] is the last exchange we had on your dissertation. In it, I said I would review a full draft and that I would review it when it was complete. (A dissertation without a conclusion is not complete). I also said I would not approve a dissertation unless it is based on the research yo[u] said you would carry out.*

*Id.*

45.   On June 25, Plaintiff submitted all of his dissertation chapters, except the conclusion, to his committee by email. That same day, following Plaintiff's submission, Brown responded by

email notifying Plaintiff for the first time that, if he did not submit the conclusion by the next day, and the committee was not able to approve that entire manuscript "as is," he saw no possibility of Plaintiff completing his dissertation in time for his summer graduation deadline.[6] *See*, **Exhibit J**, attached.

46.    Very early in the morning of June 27, Brown then notified Plaintiff by email that he was out of time. He wrote:

> *Rob, I have not received a complete draft from you. At this point … there is simply no time left. You may, of course, ask for an extension from the graduate school, but I cannot endorse it and my understanding is that it would not matter if I did – no extension would be granted.*

*Id*.

47.    As a result of the capricious deadline, Brown cut short and terminated Plaintiff's ability to complete his dissertation. Because of Brown's June 27 notification that he would no longer continue to work on Plaintiff's dissertation, it was no longer possible for Plaintiff to complete his dissertation as he lacked a dissertation committee chair. There was not enough time for Plaintiff to replace Brown as chair and re-constitute his committee in time for Plaintiff to complete his dissertation by CCAS' August 17 deadline. Thus, Plaintiff's only option was to request an extension of time to degree from CCAS to complete his dissertation.

48.    Subsequently, Plaintiff worked hard to complete his conclusion, and on July 20 Plaintiff emailed Professors Dickson and Hale the full manuscript of his dissertation, including the conclusion. Unlike Brown, Dickson and Hale had not informed Plaintiff that they were unwilling to continue to work on his dissertation.

---

[6] Brown also requested that Plaintiff provide a statement of the archival work that he had done and how his current draft differed from his previous drafts. *Id.*

49.   Brown's impromptu requirement that Plaintiff produce a draft manuscript on one-day notice by June 26 was arbitrary and capricious, and is further evidence of Brown's malfeasance aimed to prevent Plaintiff from successfully completing his dissertation. Moreover, Brown's additional requirement that the committee approve the draft "as is" was also clearly indicative of his bad faith, because Brown had breached the Brown Contract by refusing to read any chapters until Plaintiff's manuscript was complete. Thus, due solely to Brown's fault, Plaintiff had not received any feedback from Brown on his work in approximately five months since Brown had last provided feedback on Plaintiff's "Theory" chapter on January 28. The requirement that Plaintiff's complete dissertation be approved "as is" and without any feedback from his advisor after Brown had refused to read it for approximately five months was, thus, also arbitrary and capricious conduct that was aimed at preventing Plaintiff from completing his dissertation.[7]

50.   The Brown Contract did not specify any date by which Plaintiff was required to submit a complete dissertation manuscript to his committee. *See*, **Exhibit G**.

51.   There was also no fixed date by which Plaintiff was required by CCAS or the political science department to provide his committee with a draft manuscript.

52.   July 20, 2018 was four weeks before Plaintiff's August 17, 2018 (ETD) submission deadline set by CCAS. But for Brown's arbitrary, bad faith, and capricious conduct, documented in this complaint, which substantially hindered and delayed Plaintiff's progress on his dissertation, Plaintiff would have submitted his manuscript well before July 20. In addition to Brown's arbitrary, bad faith, and capricious conduct discussed elsewhere in this complaint  that delayed Plaintiff's progress,  in particular, Brown's refusal to act in accordance with the terms of the Brown Contract, and review and provide feedback on Plaintiff's chapters as they were submitted (as

---

[7] An additional issue concerned Brown's imposition of an unreasonably excessively low page limitation on Plaintiff's dissertation. For discussion of this issue, *see* **Exhibit K**, pg. 9. *See also* discussion *infra.*

opposed to breaching the Brown Contract by refusing to review and provide feedback on anything until a complete dissertation was provided) and his imposition of an arbitrarily low page limitation on Plaintiff's dissertation, impeded Plaintiff's ability to revise and submit his dissertation chapters. Had Plaintiff received feedback from Brown, such feedback would have made revising his chapters and reducing their length easier and would have saved Plaintiff a substantial amount of time such that Plaintiff would have been able to submit a complete dissertation far earlier than July 20, 2018.

53.   But for Brown's bad-faith refusal to review and proceed with Plaintiff's dissertation submitted on July 20, 2018, there would have been enough time for Plaintiff to have successfully completed his dissertation in time for Summer graduation.

### 4.   GWU endorsed its agent's bad faith actions and arbitrary and capricious conduct through the university's grievance and appeals process.

54.   On August 15, 2018, Plaintiff emailed his petition for an extension of time to degree ("Petition") to CCAS Associate Dean for Graduate Studies Jeffrey Brand, and Political Science Department DGS Eric Grynaviski. For the complete petition (with appendices), *see* **Exhibit K**, attached. In his petition, Plaintiff asserted that Brown's arbitrary, bad faith, and capricious conduct prevented him from completing his dissertation by CCAS' August 17, 2018, deadline, and thus substantively nullified and interfered with the extension that he had been given by CCAS, effectively rescinding the extension of time to degree contract.[8] Plaintiff requested additional time to complete his degree program from CCAS.

55.   On August 31, Dean Brand's ruling on the Petition, entitled "Findings, observations, and conclusions regarding the petition of Mr. Robert Frenkel for extension of time to degree",

---

[8] For the sake of brevity, this complaint does not repeat all of the arguments stated in the petition. Plaintiff requests that the Court take judicial notice of the entire petition (and appendices), attached hereto as **Exhibit K**.

dated August 30, 2018, ("Brand ruling") was emailed to Plaintiff. For the Brand ruling, *see* **Exhibit L**, attached. In the Brand ruling, Brown's arbitrary, bad faith, and capricious conduct, described *supra*, is fully and expressly condoned by GWU;[9] and Plaintiff's petition for an extension to time to degree was denied.

56.   Subsequently, Plaintiff appealed the Brand ruling. In his March 29, 2019 ruling, GWU Deputy General Counsel Charles Barber denied Plaintiff's appeal, affirming the Brand ruling in all respects ("Barber ruling"). For the Barber ruling, *see* **Exhibit M**, attached.[10] Like the Brand ruling, the Barber ruling fully and expressly condones Brown's behavior, denying any arbitrary bad faith, or capricious conduct.[11]

57.   As a tenured professor and an employee of GWU, Brown is a duly authorized agent of GWU. GWU is responsible for, and acts through, the conduct of its agents.

58.  By the Brand and Barber rulings, GWU fully and expressly ratified Brown's arbitrary, bad faith, and capricious conduct, as its agent, upholding Brown's conduct as permissible under applicable GWU policies thereby denying Plaintiff the ability to complete his Ph.D. Therefore, GWU is responsible for Brown's arbitrary, bad faith, and capricious conduct.

59.   From July 20, 2018 through August 17, 2018, GWU and its agents arbitrarily, capriciously, and in bad faith refused to take any action on Plaintiff's submitted dissertation, thereby making it impossible for Plaintiff to proceed to defend his dissertation, publish it, and take other required actions (like administrative actions) to graduate from the program. But for GWU's breach of contract and inaction, Plaintiff would have been able to timely complete the program by

---

[9] *See e.g.*, Brand ruling, par. 21, stating that: "[Plaintiff] presents no persuasive evidence that Dr. Brown's expectations were unreasonable or his decisions arbitrary or made in bad faith."
[10] The Barber ruling is generally discussed in this complaint as a decision on Plaintiff's appeal. It is not clear whether the letter from Barber received by Plaintiff's counsel was a decision on Plaintiff's appeal. Barber's letter may have instead merely been a GWU statement characterizing Plaintiff's situation. If Barber's letter was merely such a statement characterizing Plaintiff's situation, then Plaintiff asserts that he was not provided with an appeal.
[11] The Barber ruling concludes that, faculty professional "judgment was reasonably exercised with [Plaintiff.]"

August 17, 2018.  Instead, as a result of GWU's bad faith conduct and inaction, GWU terminated

Plaintiff on August 18, 2018. A copy of GWU's correspondence terminating Plaintiff from the

program is attached as **Exhibit N**.

**D.**   **Plaintiff did not receive a fair and impartial hearing on his grievance from GWU; GWU and its agents acted arbitrarily, capriciously, and in bad faith, in their review of Plaintiff's grievance, and GWU's review procedures were defective.**

60.   Since Plaintiff's grievance against Brown alleged arbitrary and capricious evaluation,

GWU's Faculty Code provides Plaintiff with certain contractual rights vis-à-vis GWU and its

agents. GWU's Faculty Code §III.C. states, in pertinent part:

> If a student alleges an instance of arbitrary or capricious academic evaluation, the allegation shall be heard and reviewed through orderly faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation takes place[.] *See*, **Exhibit O**, attached.[12]

61.   Likewise, GWU's Guide to Students Rights and Responsibilities §II.B. also

provides Plaintiff with these contractual rights, stating, in relevant part:

> Students should have protection through orderly procedures against prejudiced or capricious academic evaluation. . . . [A] student who alleges an instance of arbitrary or capricious academic evaluation shall be heard and the allegation reviewed through faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation took place. *See*, **Exhibit P**, attached.[13]

62.   GWU's Guide to Students Rights and Responsibilities also provides Plaintiff with

various rights regarding student-professor disagreements. In particular, §II.A., provides that,

"[s]tudents should be free to take reasoned exception to the data or views offered in any course of

study and to reserve judgment about matters of opinion . . . ." *Id.*[14]

---

[12] For the sake of brevity, this complaint does not provide the entire GWU Faculty Code. Plaintiff requests that the Court take judicial notice of the entire GWU Faculty Code.

[13] For the sake of brevity, this complaint does not provide the entire GWU Guide to Students Rights and Responsibilities. Plaintiff requests that the Court take judicial notice of the entirety of the same.

[14] Plaintiff was required to abide by the provisions of the GWU Guide to Students Rights and Responsibilities, *inter alia,* under the GWU University Bulletin, which states that: "All students, upon enrolling and while attending this University, are subject to the provisions of the *Guide to Students Rights and Responsibilities,* which outlines student

63.    Under D.C. law, all contracts contain an implied duty of good faith and fair dealing.

64.    Under D.C. law, the implied duty of good faith and fair dealing provides for the protection of a fair and impartial hearing in cases of academic dismissal.

65.    Thus, GWU Faculty Code's §III.C. and GWU Guide to Students Rights and Responsibilities' §II.B. mandate that a student alleging arbitrary or capricious academic evaluation shall be "heard", and Plaintiff was contractually entitled to a fair and impartial hearing on his grievance from GWU.

66.    In an effort to have his grievance – asserting arbitrary, bad faith, and capricious conduct on the part of Brown – heard, Plaintiff followed the instructions and directions of the university and its agents. However, Plaintiff did not receive a fair and impartial hearing from GWU on his grievance. Instead, GWU's agents acted arbitrarily, capriciously, and in bad faith, in their review of Plaintiff's grievance, and GWU's procedures were deficient. The review of Plaintiff's grievance was prejudiced, and there was no rational basis for GWU's agents' decisions.

---

freedoms and responsibilities of conduct, including the Code of Student Conduct (http://studentconduct.gwu.edu/code-student-conduct), and other policies and regulations as adopted and promulgated by appropriate University authorities."

### 1. Plaintiff did not receive a fair and impartial hearing on his grievance from GWU CCAS Associate Dean for Graduate Studies Jeffrey Brand.

67. In issuing the Brand ruling, GWU and its agent Brand deprived Plaintiff of his contractual right to a fair and impartial hearing on his grievance. Despite the presentation of facts in Plaintiff's petition, which were corroborated through incontrovertible email evidentiary support provided in the petition's appendices, the Brand ruling arbitrarily, capriciously, and in bad faith, disregards all facts that are unfavorable to Brown. Instead, the ruling relies on clearly erroneous facts and findings in a partial and biased effort to steer itself to a predetermined result in Brown's favor. Thus, Plaintiff did not receive an impartial hearing on his grievance. Moreover, this ruling stemmed from a lack of procedural fairness that impermissibly limited Plaintiff's ability to be heard. Thus, Plaintiff did not receive a fair hearing on his grievance.

68. On August 15, as stated *supra*, Plaintiff emailed his petition for an extension of time to degree (and appendices) to CCAS Dean Brand and Political Science Department DGS Grynaviski. That same day, Plaintiff also emailed the extension request petition (and appendices) to Brown, Dickson, and Hale.

69. On August 24th, Plaintiff then met with Dean Brand regarding his petition. In this meeting, Plaintiff was provided the ability to elaborate on his petition and respond to questions about his petition from Brand. However, by contrast to Brown – who was made aware of and provided the opportunity to review and dispute Plaintiff's assertions (through Plaintiff's August 15th email to Brown, Dickson, and Hale) – Plaintiff was not informed of, nor given an opportunity to refute, any of Brown's assertions. As such, Plaintiff was not afforded an opportunity to update the record to respond to Brown's assertions after meeting with Brand and before Brand's ruling.

70. On August 30th, Dean Brand ruled on Plaintiff's petition. Importantly, the clearly erroneous facts and findings contained in Brand's ruling are, in part, attributable to Brand's

reliance on erroneous information provided by Brown, and Plaintiff's lack of opportunity to rebut Professor Brown's assertions. The lack of opportunity for Plaintiff to respond to Brown's assertions unfairly limited Plaintiff's ability to be heard. Thus, the Brand ruling suffered from a lack of fundamental fairness, and deprived Plaintiff of his right to a fair hearing on his grievance.

71.   On August 31, Nicole Davidson, CCAS Manager of Doctoral Student Services, emailed Brand's ruling to Plaintiff. On September 14, Plaintiff emailed Ms. Davidson, apprising CCAS that he wanted to appeal the Brand ruling, and he asked Ms. Davidson as to how he could go about proceeding with his appeal.

72.   On September 18th, Ms. Davidson advised Plaintiff by email that he could appeal CCAS' decision to Teresa Murphy, GWU Deputy Provost for Academic Affairs, and that he could contact Necia Thompson, Dr. Murphy's assistant, in order to appeal.

73.   Plaintiff emailed Ms. Thompson, on September 19th, informing her that Ms. Davidson from CCAS advised him to contact her to appeal Dean Brand's ruling to Deputy Provost Murphy. Plaintiff also requested that Ms. Thompson provide him with information to appeal Brand's decision and the next steps to proceed forward with his appeal.

74.   On September 19th, Ms. Thompson replied by email stating that she would converse with Deputy Provost Murphy on the matter and provide Plaintiff with an answer to his query the next day.

75.   Plaintiff did not hear back from Ms. Thompson, so he followed up with her via email on September 27. In this email Plaintiff again asked for Ms. Thompson to advise him on how to proceed forward with his appeal.

76.   On September 27th, Ms. Thompson replied to Plaintiff by email, stating that "Deputy Provost Murphy will . . . reply to your email once a decision has been made I assure you."

77.   After not hearing anything from Deputy Provost Murphy in over five months, on March 5, 2019, through counsel, Plaintiff emailed a letter to GWU Associate General Counsel, Toi Carter, copying Murphy. Plaintiff Counsel's March 5th letter. *See*, **Exhibit Q**, attached.  In the letter, GWU was apprised that, following Ms. Thompson's September 27, 2018 email, Plaintiff had not received any further communication regarding his appeal. In addition, GWU was provided some essential points of Plaintiff's appeal.

78.   Regarding the Brand ruling, Plaintiff counsel's March 5th letter apprised GWU that the ruling was rife with substantive factual errors and erroneous conclusions, and failed to address relevant issues set forth in Plaintiff's Petition. And, furthermore, that the ruling was the consequence of a process lacking fundamental fairness that was highly prejudicial in favor of Plaintiff's dissertation advisor, Professor Nathan Brown.

79.   Despite the presentation of facts in Plaintiff's petition, which were corroborated through incontrovertible email evidentiary support provided in the petition's appendices, the Brand ruling arbitrarily, capriciously, and in bad faith, disregards all facts that are unfavorable to Brown which demonstrated Plaintiff's inability to receive a fair and impartial hearing. For example:

a. Brand clearly erroneously finds that Plaintiff was failing to make satisfactory academic progress, because he had missed deadlines that were based on a never implemented timeline.[15] In his petition and its appendices, Plaintiff provided clear email evidentiary support of the existence of the Brown Contract as the basis for proceeding forward with his work on his dissertation.[16] Nevertheless, the Brand Ruling baldly characterizes the Brown Contract as an "alleged . . . 'agreement[]'", without offering any explanation as to the reason for this conclusion. Instead, the Ruling relies on a draft timeline (Proposed Revised Dissertation Timeline, dated Nov.

---

[15] **Exhibit L**, point 17.
[16] **Exhibit K**.

13, 2017) previously proposed by Plaintiff, but never accepted by Brown, to underpin its conclusion that Plaintiff was not making sufficient academic progress.[17] Indeed, in a Nov. 18, 2017 email, Brown rejected the draft timeline, dated Nov. 13, 2017, out of hand stating that: "I don't think your timeline is really a promising basis for discussion."[18] In place of Plaintiff's proposed draft timeline, Brown insisted upon the Brown Contract, which resulted from subsequent email discussions between Plaintiff and Brown from Nov. 30 through Dec. 18, 2017 as the basis for proceeding forward. Consequently, Brand's rejection of the Brown Contract in favor of the never implement timeline, dated Nov. 13, 2017, in attempting to establish that Plaintiff failed to make sufficient academic progress, is capricious.

b. Brand clearly erroneously finds that Brown's communications with Plaintiff through Feb. 2018 indicated that Plaintiff "had become impossible to advise".[19] Plaintiff did disagree with Brown over methodology, in particular, the importance of primary source research (*i.e.* archival research) to his dissertation. However, as discussed in detail by Plaintiff in his petition, after meeting with his other committee members, on Nov. 29, 2017, Plaintiff accepted their advisement and agreed to perform archival research.[20] Thereafter, Plaintiff reiterated his willingness to do archival research in his Feb. 23 and Feb. 26, 2018 emails.[21] Accordingly, it is evident that Plaintiff was willing and cooperating, and not impossible to advise. By contrast, as discussed in detail in Plaintiff's petition, even though Plaintiff agreed to do archival research, in his Feb. 23, 2018 email, Brown picked an argument over the settled issue of archival research, and used it as a pretext to refuse to comply with the Brown Contract.[22]

---

[17] **Exhibit L**, point 17.
[18] **Exhibit F.**
[19] **Exhibit L**, point 18
[20] **Exhibit K.**
[21] *Id.*
[22] *Id.*

c. Brand clearly erroneously finds that Plaintiff had refused to perform primary research. In his Ruling, Brand asserts falsely that "by February 2018 [Plaintiff] unilaterally decided not to conduct primary research that he had previously agreed to conduct. . . .).[23] However, this assertion is flatly contradicted by Plaintiff's February 23 and February 26, 2018 emails to Brown and other committee members, which were provided in the petition's appendices. As set forth above, Plaintiff stated that he would do the primary research in both of these emails.[24] Moreover, Plaintiff in fact did the primary research, which was included in the chapters submitted to his committee on June 25, 2018. Thus, Brand's utter disregard of the facts in finding that Plaintiff's "writing process was unacceptable" based on his "unwillingness" to conduct primary source research is clearly arbitrary.

d. Brand clearly erroneously finds that Brown had not acted arbitrarily in demanding that Plaintiff meet an April 1, 2018 deadline (Spring 2018 semester deadline). In his Ruling, Brand incorrectly finds that Plaintiff's committee required Plaintiff to agree to a Spring 2018 semester deadline, and that: "It was [Plaintiff's] responsibility to meet both committee deadlines *and* CCAS deadlines."[25] However, as detailed by Plaintiff in his petition and appendices, only CCAS possessed the authority to set Plaintiff's deadline, which was August 17, 2018 (Summer 2018 semester deadline) per Plaintiff's extension of time to degree contract with GWU – and it gave Plaintiff the discretion as to whether he wished to work into the Summer 2018.[26] Therefore, Brand's finding that Brown had not acted arbitrarily in demanding that Plaintiff meet the earlier Spring 2018 semester deadline is flatly contradicted by the objective terms of Plaintiff's extension of time to degree from CCAS. Brand's attempt to draw a distinction between committee

---

[23] **Exhibit L**, point 18.
[24] **Exhibit K**.
[25] **Exhibit L**, points 7, 11
[26] **Exhibit K.**

(*i.e.* Spring) and CCAS (*i.e.* Summer) deadlines, and his attempt to excuse Brown's arbitrary refusal to comport with CCAS' Summer deadline, is a clear bad faith effort to conjure up facts favorable to Brown.

e. The Brand ruling wholly fails to address the capriciousness of Brown's giving Plaintiff one day's notice of an impromptu deadline to complete an approvable "as is" dissertation manuscript.

80.   Furthermore, the March 5th letter discussed the lack of fundamental fairness in Brand's ruling and captures the essence of the procedural bias. The letter states the following:

> The lack of procedural fairness is significant and meaningful. [Plaintiff] was never made aware of, nor given any chance to refute, any of Professor Brown's assertions. [Plaintiff] provided his Petition by email to Professor Brown the same day in which he submitted his Petition to Dean Brand (August 15, 2018). Thus, Professor Brown was aware of and afforded the opportunity to review and dispute [Plaintiff's] assertions. By contrast, [Plaintiff] had no information regarding Professor Brown's assertions, and he was not given an opportunity to rebut them. Notably, the erroneous findings contained in Dean Brand's Ruling are, in part, attributable to Dean Brand's reliance on erroneous information provided by Professor Brown, and [Plaintiff's] lack of opportunity to rebut Professor Brown's assertions.

81.   As a result of the lack of procedural fairness that impermissibly limited Plaintiff's ability to be heard, Plaintiff was prevented from being able to update the record with important irrefutable email evidence to refute Brown's assertions before Brand issued his ruling on clearly erroneous findings based on errors in the record. For example:

a.   Plaintiff was prevented from updating the record with Brown's November 18, 2017 email, which rejected Plaintiff's Proposed November 13, 2017 timeline out of hand.[27] The November 18 email conclusively establishes that the Brand ruling's reliance on the Proposed November 13, 2017 timeline is clearly erroneous.

b.   Plaintiff was prevented from updating the record with Brown's March 6, 2017

---

[27] **Exhibit F.**

email, which provides Brown's own subjective statements showing that he understood that only CCAS possessed the responsibility to determine Plaintiff's deadline.[28] The March 6 email conclusively establishes that the Brand ruling's attempt to draw a distinction between committee (*i.e.* spring) and CCAS (*i.e.* summer) deadlines was clearly erroneous.

### 2.    Plaintiff did not receive a fair and impartial hearing on his grievance from GWU Deputy General Counsel Charles Barber.

82.    In issuing the Barber ruling, GWU and its agent Barber deprived Plaintiff of his contractual right to a fair and impartial hearing on his grievance. Despite the presentation of facts in Plaintiff's petition that were corroborated through incontrovertible email evidentiary support provided in the Petition's appendices, the Barber ruling arbitrarily, capriciously, and in bad faith, disregards all facts that are unfavorable to Brown. Instead the ruling relies on clearly erroneous facts and findings in a partial and biased effort to steer itself to a predetermined result in Brown's favor. Thus, Plaintiff did not receive an impartial hearing on his grievance. Moreover, the Barber ruling stemmed from a lack of procedural fairness that impermissibly limited Plaintiff's ability to be heard by continuing to deny Plaintiff any response to Brown's assertions in response to Plaintiff's Petition. Thus, Plaintiff was denied a fair hearing on his grievance. Ultimately, the above led to the Barber ruling's reliance – in the same manner as the Brand ruling – on clearly erroneous facts and findings only explained by a biased effort to steer itself to a predetermined result in Brown's favor, denying Plaintiff a fair and impartial hearing on his grievance.

83.    Upon receiving Plaintiff's counsel's March 5th letter GWU Deputy General Counsel Charles Barber issued a cursory ruling affirming the Brand ruling in all respects and denying Plaintiff's appeal. *See*, **Exhibit M**. In the Barber ruling, which was emailed to Plaintiff's counsel, Plaintiff was informed that he would not be re-admitted to the political science doctoral program,

---

[28] **Exhibit E.**

the Barber ruling was final, and that Plaintiff did not possess any additional appeal opportunity. *Id*.

84.    The Barber ruling was not an independent review on the merits of Plaintiff's Petition or a good faith attempt to examine any bias, bad faith, or arbitrary and capricious conduct within Brown's conduct or the Brand ruling, but essentially a "rubber stamp" affirmation of the Brand ruling. For example, on the first page of the Barber ruling a large block quote is provided, stating that the quote is from Plaintiff's June 12, 2017 [sic] extension of time to degree approval. However, this language does not exist in Plaintiff's June 14, 2017, extension of time to degree email from CCAS but is a direct quote that appears in point 6 of the Brand ruling. *See*, **Exhibits C** and **L**.

85.    The cursory Barber ruling contains only two paragraphs that attempt to discuss the facts of Plaintiff's case in any detail. However, they are replete with clearly erroneous facts and findings that are given significant weight by the Barber ruling. For example:

        a. The Barber ruling relies on erroneous facts, and then contradicts itself, in its attempt to justify its findings:

            1.    To establish that Plaintiff failed to make sufficient academic progress because of missed deadlines, Paragraph 5 of the Barber ruling incorrectly states that: "[Plaintiff] submitted a timeline with the final extension detailing the steps that might, if properly executed, allow him to complete his degree by August 2018 [sic]. [Plaintiff], however, routinely failed to meet the dates set forth in this timeline. . . during the final extension." This statement shows that Barber relied on a phantom August 2018 timeline to establish that Plaintiff was not making satisfactory academic progress during his extension period. However, as made clear in Plaintiff's petition and his March 5th letter from counsel, Plaintiff submitted a "Proposed Schedule" (*i.e.* timeline) with his extension request application to CCAS that included a spring semester

deadline of April 1, 2018. As Plaintiff submitted an April 1 timeline with his extension request, *see* **Exhibit B**, the Barber ruling's reliance on the above phantom August timeline (and respective phantom timeline dates) to show that Plaintiff failed to make sufficient academic progress is clearly erroneous and factual error, as such a hard timeline with the progress steps outlined for August graduation never existed.[29]

2.     The Barber ruling then contradicts itself by further stating in Paragraph 5 that: "Professor Brown, [Plaintiff's] dissertation advisor, repeatedly notified [Plaintiff], as early as November 6, 2017 and again in February 2018 that he was not meeting the agreed upon deadlines[.]" However, in fact, these "deadlines" insisted upon by Brown were deadlines that were based on Plaintiff's proposed April 1 timeline schedule, which was submitted by Plaintiff with his extension request and does not reflect the actual Summer 2018 deadline granted by CCAS. Thus, on the one hand, the Brand ruling contradicts itself by stating that Plaintiff submitted a timeline with his extension application for August 2018 graduation, but, on the other hand, determines that Brown's conduct in insisting that Plaintiff meet deadlines for April 1 graduation was reasonable. In fact, Brown's conduct was not reasonable, but arbitrary conduct by which Brown refused to recognize the Summer 2018 deadline granted by CCAS for August 17, 2018. As the Barber ruling relies on clearly erroneous facts, and then contradicts itself based on a different set of facts, the ruling's finding of reasonably exercised professional faculty judgment is bereft of factual support and thus clearly capricious and erroneous.

b. The Barber ruling reaches erroneous findings without any factual basis for such findings:

---

[29] In fact, as made clear in Plaintiff's petition and the March 5 letter from counsel, the Brown Contract provided the basis for proceeding forward with Plaintiff's dissertation. The Brown Contract provided for Plaintiff to work on his dissertation chapters in a "sequence" insisted upon by Brown, but did not provide for any deadlines for the completions of any such chapters.

1. The Barber ruling states in Paragraph 5 that Plaintiff "resisted instruction" during his extension period. However, the ruling does not provide any factual evidence upon which this conclusion is reached. If it is inferred that Plaintiff's resisting of instruction refers to Brown's "advis[ing] him of the need to, among other things, include more primary sources[,]" which is stated in the Barber ruling's following sentence, then this ruling again misapplies the facts to support its erroneous finding. In fact, as detailed by Plaintiff in his Petition and his March 5 letter from counsel, when Plaintiff met with his other committee members on November 29, 2018, Plaintiff accepted their advisement and agreed to perform archival research; and, thereafter, Plaintiff reiterated his willingness to do archival research, *inter alia*, in his February 23, 2018 and February 26, 2018 emails. Accordingly, it is evident that Plaintiff was willing to include more primary sources in his dissertation. As such, it is thus evident that the Barber ruling's finding that Plaintiff "resisted instruction" is an assertion that failed to consider all of the pertinent facts and cherry-picked certain facts to reach a predetermined outcome.

2. In Paragraph 6, the Barber ruling states that: "[Plaintiff] finally submitted a draft in June 2018 [sic], not to Professor Brown, but to two other members of the committee.[30] The draft, however, was not complete. It lacked a conclusion . . . At this late stage in the proceedings, [Plaintiff] was obligated to submit a final and complete version of his dissertation that a committee might determine is defensible." However, in reaching the erroneous finding that Plaintiff was "obligated" to submit a final and complete version of his dissertation on June 25, 2018 (the date the draft chapters were actually submitted), the Barber ruling fails to provide any factual evidence to explain on what basis it arrived at its conclusion. This is because, in fact, there

---

[30] The draft chapters submitted in June 2018 were, in fact, submitted to all three of Plaintiff's committee members: Brown, Dickson, and Hale.

simply was not a specified date certain by which Plaintiff was "obligated" to submit a complete draft of his dissertation.

3. By asserting that Plaintiff failed to submit a final and complete version of his dissertation on June 25, 2018, as "obligated," the Barber ruling endeavors to ignore Brown's clearly capricious conduct in giving Plaintiff one day's notice of an impromptu deadline to complete an approvable "as is" dissertation manuscript where no such deadline previously existed. In addition, the Barber ruling entirely ignores the evidence of Brown's arbitrary, bad faith, and capricious conduct detailed in Plaintiff's Petition and March 5 letter from counsel that was responsible for substantially delaying Plaintiff's progress on his dissertation, and thus responsible for him submitting the chapters on June 25 in the first place and not earlier in the process.

86.  The Barber ruling arbitrarily and capriciously disregards all facts that are unfavorable to Brown and conducts such review in bad faith as evidenced by, for example:

a.  Barber's clearly erroneous factual finding that Plaintiff failed to make satisfactory progress because he had missed phantom deadlines based on a non-existent August 2018 timeline stands inapposite to the clear email evidentiary support provided in Plaintiff's Petition's appendices of the existence of the prevailing Brown Contract. Barber's utter lack of acknowledgment of the Brown Contract, while instead relying on a proposed and inapplicable timeline sourced from Plaintiffs' second extension of time to degree application with CCAS is clearly capricious.

b.  Barber's clearly erroneous finding that Plaintiff had refused to perform primary research is contradicted by Plaintiff's February 23, 2018 and February 26, 2018 emails to Professor Brown and other committee members, which were provided in Plaintiff's Petition's appendices. In both of these emails Plaintiff stated that he would do the primary research. Barber's utter

disregard of the facts in the face of being provided with indisputable email evidence to the contrary is also clearly capricious.

      c. Barber's general lack of a serious attempt at independently reviewing Plaintiff's grievance, which is exhibited by, for example:

      1. The minimalist and cursory written ruling, which blindly copies erroneous information from and defers to the Brand decision without seeking to do its own due diligence and independent investigation.

      2.  Barber issuing his ruling without the formalities of a formal hearing process or any effort to conduct such a hearing, which demonstrates the bad faith lack of care and concern to the Plaintiff's appeal to the denial of his Petition and the prescribed GWU rules and policies (i.e. the Faculty Code and Guide to Students Rights and Responsibilities) by Barber and GWU, and evidences the bad faith desire to affirm Brown's misconduct and Brand's prior decision with a biased review process based on an official record contaminated with misinformation in order to end Plaintiff's appeal and thereby his status as Ph.D. candidate at GWU.

87.   In considering Plaintiff's appeal, Barber did not interview, or offer to interview, Plaintiff before making his ruling. As such, Plaintiff was not given the opportunity to respond to any questions from Barber or provide additional evidence to supplement the record before Barber ruled on his appeal. Only after the Barber ruling was issued and its decision final was Plaintiff offered the opportunity to meet with Deputy Provost Murphy. The Barber ruling states, in pertinent part, that: "[Plaintiff] is welcome to schedule a meeting with Provost Terry Murphy if he wishes to express any concerns with his experience in the program. However, . . . [Plaintiff's] removal from the doctoral program is final." *See*, **Exhibit M**.

88.   The lack of opportunity for Plaintiff to meet with Barber and present his case before the Barber ruling was issued unfairly limited Plaintiff's ability to be heard and led to a decision based on a record devoid of all relevant facts that was the result of an intentionally biased process intended to support prior arbitrary and capricious GWU faculty decisions made in bad faith. Thus, the Barber ruling itself was arbitrary and capricious and, therefore, at the most basic level, breached the implied duty of good faith and fair dealing by depriving Plaintiff of the right to a fair hearing on his grievance.

**E. The hearing and ruling on Plaintiff's grievance by GWU Deputy General Counsel Charles Barber on appeal was procedurally defective on its face.**

89.   Charles Barber acted in his capacity as GWU Deputy General Counsel in hearing and ruling upon Plaintiff's appeal for the denial of his Petition. Barber's March 29, 2019, letter ruling is written on GWU Office of the Senior Vice President and General Counsel letterhead and is signed "Charles K. Barber Deputy General Counsel".

> **1.   Plaintiff's appeal was not heard in an "orderly" fashion, and was not the result of "faculty peer review", as prescribed by the GWU Faculty Code.**

90.   As stated *supra*, GWU's Faculty Code §III. C. provides, in pertinent part, that: "If a student alleges an instance of arbitrary or capricious academic evaluation, the allegation shall be heard and reviewed through orderly faculty peer review procedures established by the dean and faculty of the school in which the contested academic evaluation takes place[.]" **Exhibit O.**[31]

91.   GWU's Faculty Code thus provides Plaintiff with the contractual expectation of "orderly" review, and "faculty peer review", of his grievance.

92.   In an effort to have his grievance – asserting arbitrary, bad faith, and capricious conduct on the part of Brown – heard, Plaintiff followed the instructions and directions of the university and its agents. However, in following these instructions and directions, the review of Plaintiff's appeal of his grievance was neither "orderly" nor the result of "faculty peer review."

93.   Since the conduct of Plaintiff's appeal of his grievance was neither "orderly" nor the result of "faculty peer review", the hearing and ruling of Plaintiff's grievance by GWU Deputy General Counsel Charles Barber on appeal was arbitrary and procedurally defective on its face.

---

[31] For the sake of brevity, in the sections that follow, this complaint largely refers to GWU's Faculty Code §III. C. in asserting Plaintiff's above entitlements of "orderly" review and "faculty peer review". The same entitlements are also asserted by Plaintiff under GWU's Guide to Students Rights and Responsibilities §II. B. **Exhibit P**.

### 2.    The hearing and ruling on Plaintiff's appeal were not "orderly."

94.    In following the instructions and directions of CCAS, Plaintiff had a reasonable expectation that his appeal would be heard by GWU Deputy Provost for Academic Affairs, Teresa Murphy, in an "orderly" manner. However, after a period of unreasonable delay, Plaintiff's appeal was instead only heard on an *ad hoc* basis by GWU Deputy General Counsel Charles Barber. Such an untimely and *ad hoc* hearing of Plaintiff's appeal, as detailed further *infra,* was not "orderly".

95.    On August 30, 2018, CCAS Dean Brand ruled on Plaintiff's petition. Thereafter, on September 14th, Plaintiff emailed CCAS Manager of Doctoral Student Services, Nicole Davidson, apprising CCAS that he wanted to appeal the Brand ruling, and he asked Ms. Davidson as to how he could go about proceeding with his appeal.

96.    On September 18th, Ms. Davidson advised Plaintiff by email that he could appeal CCAS' decision to Teresa Murphy, GWU Deputy Provost for Academic Affairs, and that he could contact Necia Thompson, Dr. Murphy's assistant, regarding appealing.

97.    On September 19th, Plaintiff emailed Ms. Thompson informing her that Ms. Davidson from CCAS advised him to contact her to appeal Dean Brand's ruling to Deputy Provost Murphy. Plaintiff also requested that Ms. Thompson provide him with information to appeal Brand's decision and the next steps to proceed forward with his appeal.

98.    On September 19th, Ms. Thompson replied by email stating that she would converse with Deputy Provost Murphy on the matter and would provide Plaintiff with an answer to his query the next day.

99.    Plaintiff did not hear back from Ms. Thompson, so he followed up with her via email on September 27th. In this email Plaintiff again asked for Ms. Thompson to advise him on how to proceed forward with his appeal.

100.   On September 27, Ms. Thompson replied to Plaintiff by email, stating that: "Deputy Provost Murphy . . . will reply to your email once a decision has been made I assure you."

101.   After not hearing anything from Deputy Provost Thompson in over 5 months, on March 5, 2019, through counsel, Plaintiff emailed a letter to GWU Associate General Counsel, Toi Carter, copying Murphy.  In the letter GWU was apprised that, following Ms. Thompson's September 27, 2018 email, Plaintiff had not received any further communication regarding his appeal.

102.   Thereafter, on March 29, 2019, GWU Deputy General Counsel, Charles Barber, issued a ruling, affirming the Brand ruling in all respects, and denying Plaintiff's appeal. *See*, **Exhibit M**.

103.   CCAS directed Plaintiff to contact Deputy Provost Murphy's office regarding his appeal and further instructed Plaintiff that he could appeal the CCAS decision to Provost Murphy. Moreover, the Deputy Provost's office had "assured" Plaintiff that he would be contacted by Deputy Provost Murphy with a decision on his appeal.  However, ultimately, Plaintiff never received any response nor decision from Provost Murphy on his appeal. Only after Plaintiff was compelled to wait an unreasonable period of over six months – and furthermore compelled to retain counsel to intercede on his behalf to get any response from GWU – did Plaintiff receive a ruling on his appeal from GWU Deputy General Counsel Barber – without a hearing on the merits of Plaintiff's appeal or the establishment of any such process for Plaintiff's appeal.

104.   Provost Murphy took an unreasonably long period of over five months to simply delegate the hearing of Plaintiff's grievance, Plaintiff was never provided any notification of the delegation, and the delegation of authority to Deputy General Counsel Barber was inappropriately made on an *ad hoc* basis in response to GWU's receipt of Plaintiff's counsel's March 5th letter.

Thus, the hearing – which was clearly nonexistent – and the ruling by Barber on Plaintiff's appeal were not "orderly" as prescribed under GWU's Faculty Code.

105. Moreover, in no sense can a nonexistent hearing be considered "orderly." Considering that the hearing of Plaintiff's appeal of his grievance was nonexistent and thus not "orderly", the hearing and the ruling of Plaintiff's grievance by GWU Deputy General Counsel Charles Barber on appeal were both clearly arbitrary and procedurally defective on their face.

106.   Additionally, the failure of CCAS and the political science department to have in place orderly faculty peer review procedures as set forth by GWU's faculty code created the lack of an "orderly" process bereft "faculty peer review." By failing to: a) follow its policies and procedures as outlined in the Faculty Code and b) have such established processes in place, GWU violated Plaintiff's rights and contractual expectations, regardless of the nature of the process. However, the lack of such an established process led GWU and CCAS to continue to violate Plaintiffs rights and expectations by denying him "orderly faculty peer review."

### 3.   The hearing and ruling on Plaintiff's appeal were not the result of "faculty peer review."

107.   Deputy Provost Murphy's delegation of her authority to hear Plaintiff's grievance on appeal to Deputy General Counsel Barber was not appropriate, *inter alia*, because the hearing (even if one had taken place) of Plaintiff's appeal by GWU's Deputy General Counsel Barber runs afoul of Plaintiff's entitlement under GWU's Faculty Code to have his grievance reviewed through "faculty peer review".

108.   Charles Barber acted in his capacity as GWU Deputy General Counsel in hearing (*i.e.* failing to hold a hearing or establish any such process for Plaintiff's appeal) and ruling upon Plaintiff's appeal. Barber's March 29, 2019, letter ruling is written on GWU Office of the Senior

Vice President and General Counsel letterhead and is signed "Charles K. Barber Deputy General Counsel".

109.   Given the prescription under GWU's Faculty Code that Plaintiff's grievance was to be reviewed through "faculty peer review", the review of Plaintiff's appeal by Barber, acting in a non-faculty capacity as GWU Deputy General Counsel, denied Plaintiff his contractual expectation of "faculty peer review" over his appeal.

110.   Since the hearing (*i.e.* lack of a hearing) and review of Plaintiff's appeal to his grievance was not the result of "faculty peer review", the hearing and the ruling of Plaintiff's grievance by GWU Deputy General Counsel Charles Barber on appeal was arbitrary, capricious, and procedurally defective on its face.[32]

## F.   GWU is responsible for the arbitrary, capricious, and bad faith review, and failure to appropriately review, Plaintiff's grievance by its agents Brand, Barber, and Murphy.

111.   Dean Brand, Deputy General Counsel Barber, and Provost Murphy are duly authorized agents of GWU, which is responsible for the conduct of its agents.

112.   Moreover, GWU has fully ratified Brand, Barber, and Murphy's arbitrary, capricious, and bad faith conduct in reviewing Plaintiff's grievance, which includes the failure to appropriately review Plaintiff's grievance, by GWU upholding, and failing to take appropriate remedial action against, its agents' conduct and decisions in the Brand ruling, Barber ruling, and other misconduct by Murphy discussed *supra*.

---

[32] As stated *supra,* the Barber ruling is generally discussed in this complaint as a decision on Plaintiff's appeal. However, if Barber's letter was merely a statement characterizing Plaintiff's situation, then Plaintiff asserts that GWU was in breach of contract and breach of the implied duty of good faith and fair dealing implied in GWU's Faculty Code and Guide to Students' Rights and Responsibilities by not providing Plaintiff with a mechanism for appeal, and that therefore GWU's procedures regarding reviewing Plaintiff's grievance were procedurally defective on their face.

113.    Therefore, GWU is responsible for Brand, Barber, and Murphy's arbitrary, capricious, and bad faith conduct.

**G.  Plaintiff has suffered substantial and ongoing damages as the result of the arbitrary, bad faith, and capricious actions of GWU and its agents.**

114.    Plaintiff enrolled in GWU's political science Ph.D. program in the Fall semester of 2008 with the objective of graduating from the program with a Ph.D. degree, which would enable him to pursue a career as a college professor. However, as a result of the arbitrary, capricious, and bad faith conduct of GWU and its agents, which resulted in the wrongful termination of Plaintiff's enrollment in GWU and, therefore, his candidacy for the Ph.D. degree, Plaintiff's is unable to pursue a career as a professor of political science/ international relations, and thus has been irreparably harmed.

115.    At the time Plaintiff began his studies at GWU, Plaintiff already possessed two advanced graduate degrees: a Juris Doctor degree from the Benjamin N. Cardozo School of Law (1999) and a Masters in International Affairs degree from Columbia University's School of International and Public Affairs (2006). During the course of Plaintiff's studies at GWU, he received Masters degrees in Political Science and Philosophy.  However, given the advanced degrees already possessed by Plaintiff, these Masters degrees are largely valueless and only serve to highlight that Plaintiff did not complete his Ph.D. program at GWU.

116.    As a result of the arbitrary, capricious, and bad faith conduct of GWU and its agents, which resulted in Plaintiff's wrongful dismissal from GWU, Plaintiff has been substantially harmed in a number of ways, including, but not limited to:

a.    Plaintiff was substantially harmed by not earning or being provided the full opportunity to earn a valuable GWU Ph.D. degree. Due to his wrongful dismissal from GWU without the opportunity to complete his Ph.D. degree, a prerequisite to a career in education as a

professor of political science/international relations is the attainment of such a Ph.D. degree, Plaintiff is precluded from pursuing a career as such a professor. As Plaintiff cannot work as such a professor, his career and ability to earn an income has been substantially harmed. In addition, a prestigious GWU Ph.D. degree commands tremendous value in terms of enhancing employment prospects and career development more generally. As a result of Plaintiff's wrongful dismissal from GWU's Ph.D. program, his employment prospects and career development in other fields of interest such as government and public policy avenues including think tanks have been substantially harmed. Due to his wrongful dismissal from GWU and inability to earn or being provided the full opportunity to earn a valuable GWU Ph.D. degree, plaintiff has been substantially harmed due to lost wages and benefits in excess of one  million dollars, the precise amount to be proved through expert witness testimony at trial.

      b.   Plaintiff has lost ten years of income and career development. Plaintiff studied at GWU for ten years, from 2008 through 2018. During his time as a student at GWU, Plaintiff earned only a limited income from his Graduate Teaching Assistantships and University Fellowships from 2008-12, and thereafter a limited income from other work that he did on short-term contract bases for the government and as an attorney. Plaintiff's studies at GWU from 2008 through 2018 prevented him from earning substantially greater income and advancing his career in a field other than education during those years. Plaintiff is reasonably able to earn approximately $45,000 per year as a contract attorney, based on his law degree.[33] Given plaintiff's reasonable ability to earn $45,000 per year from contract attorney work, plaintiff lost approximately $450,000 in foregone salary during the ten years he spent studying at GWU. During 2008-12, Plaintiff earned a total of $74,000 in stipends and salary from GWU through his Graduate Teaching Assistantships

---

[33] This estimate is substantially based on plaintiff's earnings of $44,456 from contract attorney work in 2020.

and University Fellowships. *see* **Exhibit R**, attached In 2012-13, Plaintiff earned an income of $22,352.59 from federal government work. And, in 2013-14, Plaintiff earned an income of $13,488.34 from contract attorney work. Subtracting the above stated GWU, government, and contract attorney earnings from plaintiff's reasonable ability to earn $450,000, plaintiff lost approximately $340,000 in income from 2008 through 2018, the precise amount to be proved through expert witness testimony at trial.

      c.  Plaintiff paid tuition and provided valuable services to GWU; GWU's wrongful dismissal of Plaintiff makes it inequitable for GWU to retain these benefits without restitution through payment of their value. From 2008-2018, Plaintiff paid GWU tuition and other fees and costs in an amount of approximately a total of $18,234 out of pocket. Plaintiff also paid GWU tuition in an amount of approximately $62,914 (56 credit hours) through his Graduate Teaching Assistantships and University Fellowship tuition awards for the academic years 2008-12. In addition, through his Graduate Teaching Assistantships and University Fellowships agreements Plaintiff provided GWU with valuable services (i.e. teaching assistant, program assistant, and research assistant services) for which he was not adequately compensated as it is understood that below market compensation is provided in exchange for eventual Ph.D. degree conferment. For Plaintiff's 2008-2012 GWU Graduate Teaching Assistantships and University Fellowships agreements, *see* **Exhibit R**, attached. By dismissing Plaintiff from his Ph.D. program without conferring the degree, or even the good-faith opportunity to complete the degree, GWU breached its obligations to Plaintiff who provided such services for a below market rate. The precise amount of restitution damages to be proved through expert witness testimony at trial.

## V. CLAIMS FOR RELIEF

### Count One: Breach of Contract

117.  Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

118.  As more fully alleged in the preceding allegations of this complaint, Plaintiff was in a contractual relationship with GWU based on, *inter alia*, his enrollment agreements, which included his two extension of time to degree contracts with GWU; email exchanges between Plaintiff and Brown from approximately November 30 through December 18, 2017 (Brown Contract); and other GWU policies, procedures, codes, regulations, directives, etc., applicable to Plaintiff and GWU pursuant to Plaintiff's enrollment as a Ph.D. student at GWU, in particular, GWU's University Bulletin, Faculty Code, and Guide to Students Rights and Responsibilities.

119.  Plaintiff duly paid GWU's tuition and other fees and costs and fully complied with his enrollment agreements, the Brown Contract, and all other GWU policies, procedures, codes, regulations, directives, etc.

120.  Beginning with Plaintiff's enrollment at GWU in August 2008, through August 17, 2018, the end date of his second extension of time to degree, Plaintiff's contractual relationship with GWU provided Plaintiff with the expectation that GWU would provide educational services to Plaintiff.

121.  The second extension of time to degree contract (extension of time to degree contract) between Plaintiff and GWU was a mutually binding agreement supported by consideration on both sides. The extension of time to degree contract, which was contained in a June 14, 2017, CCAS email to Plaintiff, required that, in return for Plaintiff's payment of GWU tuition and other fees and costs (i.e. enrollment costs associated with continuous enrollment for the Summer 2018 semester), GWU was obligated to provide Plaintiff with educational services "through Summer 2018", with an August 17, 2018, ETD (Electronic Theses and Dissertations) date. *See*, **Exhibit C**.

The June 14, 2017, CCAS email offer was accepted by Plaintiff by email on June 16, 2017. *See,* **Exhibit D**.

122.    The Brown Contract between Plaintiff and Brown, and thereby GWU through its agent, was a mutually binding agreement supported by consideration on both sides.[34] The Brown Contract – which was the result of email exchanges between Plaintiff and Brown from approximately November 30 through December 18, 2017 – required that, in return for Plaintiff working on a new dissertation chapters order (sequence) that Brown prescribed, Brown agreed to return to work on Plaintiff's dissertation and was obligated to review drafts of Plaintiff's dissertation chapters on an ongoing basis as they came in through the Summer of 2018. *See*, **Exhibit G**. In a December 14th email, Brown characterized what he had agreed to as "my offer to read drafts as they come in." *Id*. In a December 18th email, Plaintiff accepted the offer. *Id*.

123.   Based on the Brown Contract, Plaintiff's contractual relationship with GWU and its agent Brown provided Plaintiff with the expectation that GWU and Brown would provide educational services to Plaintiff.

124.   As more fully alleged in the preceding allegations of this Complaint, through GWU's agent Brown's arbitrary, bad faith, and capricious conduct that was fully and expressly ratified by GWU through the Brand ruling and the Barber ruling, GWU breached its extension of time to degree contract with Plaintiff, and thereby failed to provide Plaintiff with educational services "through Summer 2018" (i.e. August 17, 2018), breaching the terms of its extension of time to degree and educational services contract with Plaintiff.

125.    Plaintiff fully complied with the Brown Contract. In line with the prescribed sequence in the Brown Contract, Plaintiff submitted revisions to a chapter (Theory Chapter) on

---

[34] The allegations *infra* stated as breaches of the Brown Contract – in this Count and others – are also asserted by Plaintiff to be in breach of the extension of time to degree contract.

January 22ⁿᵈ. In line with the sequence, Plaintiff then proceeded to work on his next chapter (Jordan chapter), which included the archival research prescribed by the Plaintiff's dissertation committee.

126.  By GWU's agent Brown's bad faith conduct – which was fully and expressly ratified by GWU by the Brand ruling and the Barber ruling – Brown, and thereby GWU, breached the terms of the Brown Contract with Plaintiff. In a February 26 email, Brown wrote that he would no longer review drafts of Plaintiff's dissertation chapters on an ongoing basis as they came in, as he had committed to do in the agreement. Instead, Brown stated that he would only review any further work after Plaintiff had completed a full draft of his dissertation, which exhibited bad faith in failing to honor his prior agreement with Plaintiff under the Brown Contract. *See*, **Exhibit H**. As stated, under the Brown Contract, Brown's bargain with Plaintiff – and thereby GWU's bargain with Plaintiff – prescribed Brown's reading Plaintiff's chapters on an ongoing basis through the Summer of 2018.

127.  Under D.C. law the prevention doctrine is recognized, whereby, if one contracting party's actions are the cause for another party's failure to satisfy a condition in the contract, he cannot take advantage of that failure. By GWU's agent Brown's breaches of the extension of time to degree contract and Brown Contact, which were fully and expressly ratified by GWU, GWU's agent Brown's actions, and thereby GWU's actions, through Brown's arbitrary, bad faith, and capricious conduct, were, *inter alia*, the cause of substantial interference with and delay in Plaintiff's work progress, and GWU's refusal to perform its contractual obligations were the cause of Plaintiff's inability to continue to perform under the contracts. GWU's actions causing substantial interference with and delay in Plaintiff's work progress, and GWU's refusal to perform its contractual obligations, prevented Plaintiff from defending, publishing, and taking the other

necessary actions (i.e. administrative actions) concerning his dissertation in time to satisfy the August 17, 2018 ETD deadline and whereby Plaintiff would complete his Ph.D. degree by the ETD date. Therefore, GWU cannot take advantage of Plaintiff's inability to meet the August 17, 2018 ETD deadline as it was made impossible by GWU's breach of its contractual obligations to Plaintiff.

128.   As more fully alleged in the preceding allegations of this complaint, in conjunction with GWU's breach of its contracts with Plaintiff, including *inter alia* the extension of time to degree contract, the Brown Contract, and other GWU policies, procedures, codes, regulations, directives, etc., particularly GWU's University Bulletin, Faculty Code, and Guide to Students Rights and Responsibilities, GWU wrongfully terminated Plaintiff's candidacy for the Ph.D. degree and overall enrollment at GWU, thereby causing him monetary and other damages.

129.   In conjunction with Brown's, and thereby GWU's, breach of the Brown Contract, GWU wrongfully terminated Plaintiff's candidacy for his Ph.D. degree and his enrollment at GWU, thereby causing him monetary and other damages.

WHEREFORE Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, and grant him the following relief:

(a) Find and declare that Defendant George Washington University breached its contract with Plaintiff, as described in this complaint;

(b)  Find and adjudge that Defendant is liable to Plaintiff for damages;

(c) Award Plaintiff compensatory damages against Defendant in an amount to be determined at trial, but which is expected to exceed $1 million;

(d) Order the payment of the costs of this action to the extent allowed by law;

(e) Order the payment of pre-judgment interest from August 17, 2018, and post-judgment interest on all damages at the statutory judgment rate of interest; and

(f) Award Plaintiff any and all other additional relief as the Court deems appropriate.

**Count Two: Breach of the Implied Duty of Good Faith and Fair Dealing**

130.   Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

131.   The contract between the parties contained an implied covenant of good faith and fair dealing, which precludes the Defendant from evading the spirit of the contracts, willfully rendering imperfect performance, refraining from interference with the Plaintiff's ability to benefit from the contracts' terms, acting in contravention of the Plaintiff's reasonable expectations, failing to abide by standards and policies promulgated by the Defendant and/or agreed to by the parties, or otherwise acting in an arbitrary and capricious manner with respect to the Plaintiff.

132.   The Defendant breached this implied covenant of good faith and fair dealing as set forth herein in the preceding paragraphs, including, but not limited to, by:

a. Ratifying Brown's arbitrary refusal to accept CCAS' Summer 2018 semester deadline, which was stipulated in Plaintiff's extension of time to degree contract with GWU, through his insistence on an earlier Spring 2018 semester deadline. Brown's arbitrary action interfered with Plaintiff's performance under the contract by *inter alia* substantially interfering with his ability to proceed with his dissertation work which delayed the completion of such work;

b. Ratifying Brown's bad faith breach of the Brown Contract, which further elaborated GWU's provision of educational services under the extension of time to

46

degree contract by obligating Brown to review Plaintiff's dissertation draft chapters on an ongoing basis. After reviewing only a single dissertation chapter draft, Brown willfully rendered imperfect performance under the contract with Plaintiff by subsequently refusing to review anything other than a completed dissertation manuscript;

c. Ratifying Brown's capricious conduct that gave Plaintiff one day's notice of an impromptu deadline to complete an approvable "as is" dissertation manuscript. In setting this impromptu deadline, Brown *inter alia*, abused his power relative to Plaintiff to specify terms that were impossible for Plaintiff to fulfill, thereby interfering with Plaintiff's ability to perform under the contract, and unilaterally terminating Plaintiff's ability to perform under the contract on June 27, 2018;

d. Ratifying Brown's cumulative arbitrary, bad faith, and capricious conduct. Brown eventually acceded to CCAS' Summer 2018 deadline, in form but not in substance. By Brown continuing his arbitrary, bad faith, and capricious actions, it is clear that he never accepted the deadline in substance and endeavored to (and did in fact) evade the spirit of the extension of time to degree contract by making it impossible for Plaintiff to complete his dissertation in line with CCAS' Summer 2018 deadline;

e. Failing to ensure that established procedures were in place to ensure Plaintiff's grievance and appeal were heard and decided according to the GWU Faculty Code and the Guide to Students Rights and Responsibilities;

f. Failing to ensure that Plaintiff's grievance hearing by Dean Brand was carried out in a fair and impartial manner;

g. Failing to ensure that the hearing and decision rendered on Plaintiff's grievance by GWU Deputy General Counsel Charles Barber was carried out in a fair and impartial manner; and

h. Failing to adhere to provisions prescribed in the GWU Faculty Code and the Guide to Students Rights and Responsibilities that rendered the hearing, or lack thereof, and ruling on Plaintiff's grievance by GWU Deputy General Counsel Charles Barber on appeal defective on its face, considering: i) Plaintiff's appeal was not heard nor ruled on in an "orderly" fashion, and ii) Plaintiff's appeal was not heard in a process that was the result of "faculty peer review".[35]

133.   The Defendant breached this implied covenant of good faith and fair dealing by making it impossible for the Plaintiff to realize the benefit of his contract and by permitting its agents to act in bad faith and in a manner which interfered with the Plaintiff's contractual expectations. Defendant's actions had the effect of injuring and destroying Plaintiff's right to receive the fruits of his contractual relations with Defendant.

134.   GWU's breach of the implied covenant of good faith and fair dealing represents a breach of the entire contract.

WHEREFORE Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, and grant him the following relief:

---

[35] Moreover, if Barber's letter to Plaintiff's counsel was merely a statement characterizing Plaintiff's situation, then Defendant breached the implied duty of good faith and fair dealing implied in the GWU Faculty Code and Guide to Students Rights and Responsibilities by failing to provide Plaintiff with an appeal.

(a) Find and declare that Defendant George Washington University breached the implied duty of good faith and fair dealing in its contract with Plaintiff, as described in this complaint;

(b)  Find and adjudge that Defendant is liable to Plaintiff for damages;

(c) Award Plaintiff compensatory damages against Defendant in an amount to be determined at trial, but which is expected to exceed $1 million;

(d) Order the payment of the costs of this action to the extent allowed by law;

(e) Order the payment of pre-judgment interest from August 17, 2018, and post-judgment interest on all damages at the statutory judgment rate of interest; and

(f) Award Plaintiff any and all other additional relief as the Court deems appropriate.

### Count Three: Unjust Enrichment

135.  Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

136.  Plaintiff performed his contractual obligations in good faith, and GWU's bad faith and refusal to perform its obligations caused Plaintiff to be unable to finish performing his contractual obligations.

137.  If the Court does not find for Plaintiff on Counts One or Two, Plaintiff pleads in the alternative that he is entitled to recover from GWU for unjust enrichment.

138.  During Plaintiff's enrollment at GWU from August 2008 through the end date of his second extension of time to degree of August 17, 2018, Plaintiff paid GWU tuition and other fees and costs in an amount approximately $18,234 out of pocket and paid GWU tuition in an amount of approximately $62,914 (the cost of 56 credit hours) via his Graduate Teaching Assistantships

and University Fellowship tuition awards for the academic years 2008-09, 2009-10, 2010-11, and 2011-12. Through his Graduate Teaching Assistantships and University Fellowships agreements, Plaintiff also provided GWU with valuable services (i.e. teaching assistant, program assistant, and research assistant services) for which he was not adequately compensated. *See*, **Exhibit R**, attached.

139.   Plaintiff's payment of tuition and other fees and costs, and provision of valuable services conferred a benefit upon GWU in an amount exceeding FIVE HUNDRED THOUSAND DOLLARS ($500,000).

140.   GWU was aware of, and had knowledge of, the benefits conferred upon it by Plaintiff and accepted such benefits.

141.   GWU accepted, retained, and made use of the benefits conferred upon it by Plaintiff; however, GWU's wrongful termination of Plaintiff's candidacy for the Ph.D. degree and enrollment at GWU makes it inequitable for GWU to retain these benefits without restitution and payment of their value.

142.   Plaintiff's payment of tuition and other fees and costs, and provision of services had a value in excess of FIVE HUNDRED THOUSAND DOLLARS ($500,000), which GWU unjustly kept the benefit of and never provided Plaintiff with restitution and adequate compensation.

143.   Allowing GWU to keep Plaintiff's above-referenced payment of tuition and other fees and costs, and provision of services would unjustly enrich GWU.

144.   By reason of the foregoing, GWU is liable to Plaintiff for damages of at least FIVE HUNDRED THOUSAND DOLLARS ($500,000).

WHEREFORE Plaintiff respectfully requests that the Court find that Defendant was unjustly enriched, and grant Plaintiff the following relief:

(a) Find and declare that Defendant George Washington University has been unjustly enriched, as described above;

(b) Find and adjudge that Defendant is liable to Plaintiff for damages;

(c) Award Plaintiff compensatory damages against Defendant in an amount to be determined at trial, but which is expected to exceed FIVE HUNDRED THOUSAND DOLLARS ($500,000);

(d) Order the payment of the costs of this action to the extent allowed by law;

(e) Order the payment of pre-judgment interest from August 17, 2018, and post-judgment interest on all damages at the statutory judgment rate of interest; and

(f) Award Plaintiff any and all other additional relief as the Court deems appropriate.

**<u>Count Four: Promissory Estoppel/ Detrimental Reliance</u>**

145.  Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if set forth fully herein.

146. Plaintiff was in a contractual relationship with GWU based on, *inter alia*, his enrollment agreements, which included his two extension of time to degree contracts with GWU; email exchanges between Plaintiff and Brown from approximately November 30 through December 18, 2017 (Brown Contract); and other GWU policies, procedures, codes, regulations, directives, applicable to Plaintiff and GWU pursuant to Plaintiff's enrollment as a Ph.D. student at GWU, in particular, GWU's University Bulletin, Faculty Code, and Guide to Students Rights and Responsibilities.

147.  Plaintiff entered into the Brown Contract based on the promise of Brown to review drafts of Plaintiff's dissertation chapters on an ongoing basis as they came in. *See*, **Exhibit G**.

148.  Plaintiff reasonably relied upon such promise.

149.  Plaintiff relied upon such promise to his detriment.

150.  A refusal to enforce such promise would result in injustice to Plaintiff.

151.  Plaintiff performed his contractual obligations in good faith, and GWU's bad faith and refusal to perform its obligations caused Plaintiff to be unable to finish performing his contractual obligations.

WHEREFORE Plaintiff respectfully requests that the Court enter judgment in his favor and grant him the following relief:

(a) Find and declare that Defendant George Washington University is estopped and enjoined from terminating Plaintiff's enrollment;

(b) Order that Defendant George Washington University reinstate Plaintiff in the political science doctoral program at GWU's Columbian College of Arts and Sciences;

(c) Order that Defendant George Washington University assemble a dissertation committee that is acceptable to Plaintiff;

(d) Order that Defendant George Washington University appoint a dissertation committee chair that is acceptable to Plaintiff;

(e) Order that Defendant George Washington University afford Plaintiff sufficient time to complete, defend, and publish his dissertation and complete any remaining degree requirements. More specifically, given *inter alia* that Plaintiff will have been out of school for a significant period of time prior to such

reinstatement, a sufficient period of time is believed by Plaintiff to be two years. Except that, if Plaintiff's dissertation is deemed no longer viable (for example, in the interim Plaintiff's dissertation topic has been written on by another student), then a sufficient period of time is believed by Plaintiff to be four years.

(f)  Order that, in the event that Plaintiff's dissertation is deemed no longer viable (for example, in the interim Plaintiff's dissertation topic has been written on by another student), then Plaintiff be awarded ONE MILLION DOLLARS ($1,000,000) in compensatory damages for the additional two years required to be expended by Plaintiff to complete his dissertation;

(g)  Order the payment of the costs of this action to the extent allowed by law;

(h)  Order the payment of pre-judgment interest from August 17, 2018, and post-judgment interest on all damages at the statutory judgment rate of interest; and

(i)  Award Plaintiff any and all other additional relief as the Court deems appropriate.

## VI. JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a jury trial on all issues so triable raised in this case, including but not limited to issues of fact and damages.

Respectfully Submitted,

ROBERT FRENKEL

By Counsel,

Dated: February 22, 2021                            /s/ Alfredo Acin
                                                    Alfredo Acin, VSB # 76445
                                                    OFFIT KURMAN, P.C.
                                                    8000 Towers Crescent Drive, Suite 1400
                                                    Tysons Corner, Virginia 22182
                                                    Telephone: (703) 745-1827
                                                    Facsimile: (703) 745-1835
                                                    aacin@offitkurman.com
                                                    *Counsel for Plaintiff*